**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| BRYAN TILLER,<br><br>Plaintiff,<br><br>v.<br><br>ILLINOIS DEPARTMENT OF FINANCIAL AND PROFESSIONAL REGULATION,<br><br>Defendant. | No. 24 C 5472<br><br>Judge John F. Kness |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Bryan Tiller was employed by the Illinois Department of Financial and Professional Regulation (IDFPR) as the supervisor of the title insurance section until IDFPR terminated his employment in 2023. In this ensuing lawsuit, Plaintiff alleges that IDFPR terminated him because of his disability (ADHD) and his efforts to disclose that disability through a statutorily-protected process. Plaintiff also alleges that IDFPR failed to accommodate him by failing to engage in a collaborative process to identify an accommodation for Plaintiff.

Following a period of discovery, IDFPR now seeks summary judgment in its favor. As explained below, the Court agrees that Plaintiff has failed to produce sufficient evidence to permit a jury to conclude that IDFPR acted with an improper motive in terminating Plaintiff's employment. In addition, the undisputed record further reveals that Plaintiff, not IDFPR, failed adequately to engage in the

collaborative accommodation process. Accordingly, IDFPR is entitled to summary judgment.

## I. BACKGROUND

IDFPR is the state agency responsible for licensing and regulating a host of professions ranging from locksmiths to veterinarians. Plaintiff, who was diagnosed with ADHD in 1994, began working for IDFPR in May 2018 and served as the "Supervisor of the Title Insurance Section" before his employment was terminated in 2023. (Dkt. 32 ¶¶ 1, 64; Dkt. 34 ¶¶ 1, 64.) Acting as Title Insurance Supervisor, Plaintiff was responsible for managing staff and administrative operations within the title insurance section, ensuring timely completion of annual examinations for title insurance professionals, processing licensing applications, conducting presentations for the benefit of insurance industry professionals, and training, supervising, and evaluating subordinate employees. (Dkt. 32 ¶ 3; Dkt. 34 ¶ 3.) Plaintiff reported to the Director of the Division of Financial Institutions, Francisco Menchaca, and Deputy Director Shelmun Dashan. (Dkt. 32 ¶¶ 6–7; Dkt. 34 ¶¶ 6–7.)

IDFPR supervisors complete annual evaluations of subordinate employees' work and then review those evaluations with the employee. Director Menchaca completed an annual evaluation of Plaintiff's job performance for the period between June 1, 2019 and May 31, 2020; Plaintiff signed that evaluation on June 23, 2020. (Dkt. 32 ¶ 15; Dkt. 34 ¶ 15.) Plaintiff received an "unacceptable" evaluation in the categories of initiative, quality, productivity, and leadership. (Dkt. 32 ¶ 16; Dkt. 34 ¶ 16.) Director Menchaca noted that Plaintiff failed to meet deadlines and attend

meetings in a timely fashion. (Dkt. 32 ¶ 17; Dkt. 34 ¶ 17.) Plaintiff also failed to ensure that work assigned to subordinates was completed on time. (Dkt. 32 ¶ 18; Dkt. 34 ¶ 18.) Plaintiff acknowledged receiving this evaluation, but disputes that it is an accurate assessment of his performance. (Dkt. 32 ¶ 19; Dkt. 34 ¶ 19.)

Plaintiff received his next annual evaluation on June 6, 2021 for the period between May 1, 2020 and April 30, 2021. (Dkt. 32 ¶ 20; Dkt. 34 ¶ 20.) Plaintiff received an unacceptable evaluation in the categories of planning, initiative, quality, productivity, and leadership. (Dkt. 32 ¶ 21; Dkt. 34 ¶ 21.) Plaintiff also received a ranking of "exceptional" in human relations, among other categories. (Dkt. 34 ¶ 7.) Director Menchaca again noted that Plaintiff failed to complete tasks and attend meetings on time. (Dkt. 32 ¶ 22; Dkt. 34 ¶ 22.) Plaintiff also failed to submit evaluations of subordinates on time and submitted work product that required multiple revisions. (*Id.*) Finally, Director Menchaca also noted that Plaintiff failed to ensure that subordinates completed annual examinations for title insurance underwriters. (Dkt. 32 ¶ 23; Dkt. 34 ¶ 23.) Plaintiff acknowledged, but disagreed with, this assessment. (Dkt. 32 ¶ 24; Dkt. 34 ¶ 24.)

On June 22, 2021, IDFPR Chief of Staff Michael Morthland instructed Director Menchaca to address Plaintiff's poor job performance in collaboration with Temi Bennett. (Dkt. 32 ¶ 26.) Menchaca decided to formulate a Corrective Action Plan ("CAP") to help Plaintiff address his poor job performance. (*Id.* ¶ 27.) Because issuance of the CAP closely followed his January 2022 attempted disability disclosure, Plaintiff believes the CAP was an attempt to paper his file with

disciplinary admonitions rather than a good-faith effort to help him improve his performance. (Dkt. 32 ¶ 27; Dkt. 34 ¶ 27.) According to the record, efforts to draft the CAP began on June 29, 2021, when Temi Bennett sent an email to Director Menchaca including a CAP template and instructions for devising the plan. (Dkt. 32 ¶ 30; Dkt. 34 ¶ 30.) But the CAP was not signed and dated until January 26, 2022. (Dkt. 32-2 at 48:12.)

In the interim, on June 23, 2021, Plaintiff received an email from Tyler Hanners and Temi Bennett directing Plaintiff to fill out the attached reasonable accommodation request (RAR) form and to return it to Temi Bennett if he wanted to request an accommodation.[1] (Dkt. 32 ¶ 28; Dkt. 34 ¶ 28.) Temi Bennett did not receive a completed RAR form from Plaintiff. (Dkt. 32 ¶ 29; Dkt. 34 ¶ 29.)

On January 11, 2022, Plaintiff sent an email to Menchaca, Dashan, and Bennett stating that "[m]uch of the workplace problems are due to a neurological disorder I have," and that he was "awaiting an accommodation letter from [his] doctor and [would] provide it as per policy." (Dkt. 32 ¶ 33; Dkt. 34 ¶ 33.) On January 12, 2022, Temi Bennett replied to Plaintiff's email with an email containing an attached RAR form and instructions to provide supporting documentation. (Dkt. 32 ¶ 36; Dkt. 34 ¶ 36.) Menchaca also replied that he was unaware of Plaintiff's condition, offered Plaintiff sick leave, and expressed his wish for Plaintiff's full recovery. (Dkt. 32 ¶ 37; Dkt. 34 ¶ 37.)

[1] The parties have not stipulated to any facts about the inception of this email exchange, but Temi Bennett testified that Plaintiff must have contacted Tyler Hanners at some point before this email exchange. Plaintiff does not dispute receiving this email from Tyler Hanners but does not recall contacting him before receiving the email. (Dkt. 32-1 at 163:13.)

On January 26, 2022, Menchaca finalized Plaintiff's CAP. (Dkt. 32 ¶ 41; Dkt. 34 ¶ 41.) The CAP set out Plaintiff's deficiencies and enumerated the corrective measures that would need to be implemented. On February 4, 2022, Plaintiff met with Menchaca and Dashan to discuss the CAP. (Dkt. 32 ¶ 42; Dkt. 34 ¶ 42.) Plaintiff signed the CAP but does not concede that he agreed with the deficiencies listed in it. (Dkt. 32 ¶ 43; Dkt. 34 ¶ 43.)

Deputy Director Dashan completed Plaintiff's third and final annual evaluation for the June 1, 2021 to May 31, 2022 evaluation period, which Plaintiff reviewed and signed on June 8, 2022. (Dkt. 32 ¶ 44; Dkt. 34 ¶ 44.) Plaintiff received unacceptable evaluations in the categories of planning, initiative, quality, productivity, and leadership. (Dkt. 32 ¶ 45; Dkt. 34 ¶ 45.) Dashan noted that Plaintiff failed to complete annual licensing exams, failed to supervise subordinates, misrepresented his progress on assigned work, failed to meet deadlines, failed to provide accurate information in reports, and submitted work product that required multiple revisions. (Dkt. 32 ¶ 46; Dkt. 34 ¶ 46.) Plaintiff again received an overall evaluation of "unacceptable." (Dkt. 32 ¶ 45; Dkt. 34 ¶ 45.)

Director Menchaca felt that Plaintiff failed to improve his performance after receiving his 2021–2022 performance evaluation. (Dkt. 32 ¶ 47–48; Dkt. 34 ¶ 47–48.) Menchaca also found that Plaintiff's inadequate job performance negatively impacted IDFPR's operations and unnecessarily delayed title insurance agents from lawfully conducting business in Illinois. (Dkt. 32 ¶ 47–48; Dkt. 34 ¶ 47–48.) Plaintiff does not concur with Menchaca's conclusions and states that these issues were never

communicated to him. (Dkt. 32 ¶ 47–48; Dkt. 34 ¶ 47–48.) With the approval of IDFPR Secretary Mario Treto, Menchaca made the decision to terminate Plaintiff's employment. (Dkt. 32 ¶ 49; Dkt. 34 ¶ 49.) Menchaca notified other IDFPR employees that Plaintiff's termination was approved at 8:59 a.m. on January 25, 2023. (Dkt. 32-18 at 1.)

Later that day, at 10:54 a.m., Plaintiff sent an email to Deputy Director Dashan stating that he thought it was "best to formally request reasonable accommodations." (Dkt. 32 ¶ 51; Dkt. 34 ¶ 51.) Plaintiff also attached a completed RAR form, stated that he would forward it to the ADA administrator, and asked if he should provide additional information. (Dkt. 32 ¶ 51; Dkt. 34 ¶ 51.) Plaintiff completed RAR form stated that Plaintiff had an "official diagnosis of ADHD and accompanying co-morbids." (Dkt. 32 ¶ 52; Dkt. 34 ¶ 52.) Plaintiff requested "job restructuring or task modification" including "modification of deadline structure. Modification of detail orientation. Modification of deadline levels and level of detail worked [sic] required in addition to work hours." (Dkt. 32 ¶ 52; Dkt. 34 ¶ 52.)

Dashan replied to Plaintiff and directed him to forward his completed RAR form to Menchaca and Tyler Hanners. (Dkt. 32 ¶ 55; Dkt. 34 ¶ 55.) Plaintiff forwarded the form to Menchaca. (Dkt. 32 ¶ 56; Dkt. 34 ¶ 56.) On January 28, Temi Bennett responded to Plaintiff's January 25 email asking Plaintiff to submit a statement from a medical provider detailing the nature, severity, and duration of Plaintiff's impairments and appropriate work restrictions by February 3, 2023. (Dkt. 32 ¶ 57; Dkt. 34 ¶ 57.) Plaintiff replied to Bennett's email on February 6, 2023, stating that

his doctor had not returned the requested statement and sought an extension until February 10 to produce the documents. (Dkt. 32 ¶ 58; Dkt. 34 ¶ 58.) Plaintiff's request for an extension was granted. (Dkt. 32 ¶ 56; Dkt. 34 ¶ 56.) Plaintiff never provided IDFPR with a statement from any medical professional regarding his disability or any required accommodations. (Dkt. 32 ¶ 60; Dkt. 34 ¶ 60.)

In a February 15, 2023, meeting, Menchaca and Dashan informed Plaintiff that his employment was being terminated. (Dkt. 32 ¶ 61; Dkt. 34 ¶ 61.) Plaintiff declined an offer to be allowed to resign in lieu of termination and chose to be formally terminated. (Dkt. 32 ¶ 62; Dkt. 34 ¶ 62.)

On November 9, 2023, Plaintiff filed a charge of discrimination with the Equal Opportunity Employment Commission ("EEOC"). Plaintiff's charge stated:

> I began my employment with Respondent on or about May 5, 2018. My most recent position was Supervisor of Title Insurance Department. During my employment, I disclosed my disability to Respondent and requested a reasonable accommodation. On or about February 15, 2023, I was discharged. I believe that I have been discriminated against because of my disability, in violation of the Americans with Disabilities Act of 1990, as amended.

(Dkt. 32 ¶ 63; Dkt. 34 ¶ 63.)

Plaintiff filed the present lawsuit on June 28, 2024. (Dkt. 1) Plaintiff alleges that he was subject to unlawful discrimination due to his disability: specifically, Plaintiff alleges that he was discriminated against when he was fired (Count I), that IDFPR failed to accommodate his disability when it failed to engage in an interactive discussion with Plaintiff about his disability (Count II), and that he was fired in retaliation for disclosing his disability and seeking reasonable accommodations

(Count III). (Dkt. 1) After discovery, IDFPR filed a motion for summary judgment. (Dkt. 31.)

## II. STANDARD OF REVIEW

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008) (quoting *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005)); *see also* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. As the " 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (quotations omitted).

## III. DISCUSSION

IDFPR seeks summary judgment on all claims in the complaint. According to IDFPR, Plaintiff failed to exhaust his available administrative remedies. IDFPR further argues that Plaintiff failed to produce sufficient evidence to meet his burden of proof on his discrimination, retaliation, and failure to accommodate claims. For the

reasons that follow, the Court holds that Plaintiff sufficiently pursued his administrative remedies, but his claims fail on the merits. As the undisputed facts reflect, Plaintiff abandoned the disability disclosure process, and he cannot point to evidence sufficient to support a reasonable inference that IDFPR acted with any improper motive. Accordingly, IDFPR is entitled to summary judgment in its favor.

### A. Plaintiff Sufficiently Exhausted His Administrative Remedies

#### *1. Plaintiff's Claim Has a Limited Temporal Scope*

Under the Americans with Disabilities Act, prospective plaintiffs must bring a claim of discrimination relating to an unlawful employment practice within 300 days of the alleged unlawful employment practice occurring. Claims brought beyond this 300-day window may not proceed. IDFPR argues that much of Plaintiff's cited evidence is drawn from events outside of that 300-day window and thus cannot provide Plaintiff with a viable cause of action. (Dkt. 33 at 5–6.) Plaintiff concedes that some of his evidence is more than 300 days old at the time of filing, but argues that it serves as background evidence, rather than the basis for independent causes of action. (Dkt. 37 at 3.)

As the Supreme Court has explained, plaintiffs may use evidence from beyond the 300-day window to support their claims under the ADA when the basis for the charge of discrimination occurs within the 300-day window. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 112 (2002). Plaintiff's claims are limited to alleged unlawful employment practices by IDFPR occurring on or after January 13, 2023. As

a result, the analysis must focus on Plaintiff's termination as the operative adverse employment action.

*2. Plaintiff Exhausted Administrative Remedies*

IDFPR argues that Plaintiff failed to exhaust administrative remedies as to Plaintiff's retaliation claim because Plaintiff's original EEOC charge does not state that retaliation was the cause of his discharge. Plaintiff argues that he is entitled to a broad reading of his original EEOC charge that includes retaliation as a related claim. Plaintiff's argument prevails.

Before filing suit under Title VII in federal court, a plaintiff is required to bring their charges before the EEOC and may not bring suit on claims not presented to the EEOC. To meet this requirement, plaintiffs must state claims that are, at a minimum, "like or reasonably related" to the charges brought to the EEOC. This formulation means, in essence, the same conduct that implicates the same individuals. *Cheek v. W. & S, Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994). As the Seventh Circuit has explained, retaliation and discrimination charges ordinarily are "not considered 'like or reasonably related' to one another." *Swearnigen-El v. Cook Cnty. Sheriff's Dept.*, 602 F.3d 852, 864–865 (7th Cir. 2010); *see also Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003). But because plaintiffs often file EEOC charges pro se, the charges are interpreted broadly and with "utmost liberality." *Eggleston v. Chi. Journeymen Plumbers' Loc. Union No. 130, U. A.*, 657 F.2d 890, 906 (7th Cir. 1981). To survive, a plaintiff must bring claims that "describe the same

circumstances and participants" as described in their EEOC charge. *Cervantes v. Ardagh Group*, 914 F.3d 560, 565 (7th Cir. 2019).

Plaintiff's discrimination and retaliation claims are reasonably related to his EEOC charge. Plaintiff's charge stated that he suffered discrimination and that he disclosed his disability and was thereafter discharged. (Dkt. 32 ¶ 63; Dkt. 34 ¶ 63.) If anything, Plaintiff's charge reads more like an allegation of retaliation than discrimination. Moreover, Plaintiff's claims represent two theories of causation for one occurrence (his termination), rather than claims relating to different adverse employment actions. And both instances involved an overlapping group of individuals including Director Menchaca, Deputy Director Dashan, and Temi Bennett. (Dkt. 32 ¶¶ 30, 56, 61; Dkt. 34 ¶¶ 30, 56, 61.) Plaintiff's EEOC charge is thus reasonably related to the claims Plaintiff now presents in federal court. Accordingly, Plaintiff exhausted his EEOC remedy, and IDFPR is not entitled to judgment as a matter of law on these grounds.

### B. The Failure to Accommodate Claim Fails

IDFPR argues that Plaintiff cannot maintain a claim for failure to accommodate because Plaintiff failed to provide medical documentation explaining his limitations and the accommodations he required to continue working. (Dkt. 33 at 12–13.) Plaintiff argues that IDFPR should have done more to ascertain a reasonable accommodation for Plaintiff regardless of the lack of documentation. (Dkt. 37 at 11–13.) IDFPR's position is correct.

When an employee discloses a disability to their employer and seeks an accommodation, the parties are expected to engage in an interactive process to determine whether a reasonable accommodation exists. Employers satisfy their duty to accommodate if they do what is necessary to allow the employee to work in reasonable comfort. *See Vande Zande v. Wisc. Dep't of Admin.*, 44 F.3d 538, 546 (7th Cir. 1995). Employers, however, need provide only reasonable accommodations and are not obliged to provide every accommodation sought by the employee. *Rehling v. City of Chicago*, 207 F.3d 1009, 1014 (7th Cir. 2000). Moreover, employers are not liable for failing to engage in the collaborative process alone and are liable only for failing to engage if that failure inhibits finding a reasonable accommodation for the employee. *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1039 (7th Cir. 2013). Because the process is collaborative, employees are also required to "uphold [their] end of the bargain" and participate in the collaborative process. *Steffes v. Stepan Co.*, 144 F.3d 1070, 1073 (7th Cir. 1998). An employee who abandons the process—such as by failing to clarify the extent of his medical conditions—cannot foist liability on the employer. *Id.*

Plaintiff abandoned the collaborative process and cannot hold IDFPR liable for failing to accommodate him. According to the record, Plaintiff was asked to provide medical documentation to clarify what his limitations were and what accommodations Plaintiff needed. (Dkt. 32 ¶ 58; Dkt. 34 ¶ 58.) Plaintiff also admits that he did not expect IDFPR to know what accommodations would be necessary based solely on the form submitted. (Dkt. 32 ¶ 53; Dkt. 34 ¶ 53.) But Plaintiff did not

provide the requested documentation. (Dkt. 32 ¶¶ 58–60; Dkt. 34 ¶¶ 58–60.) Even after seeking an extension,[2] Plaintiff still failed to provide the documentation necessary to continue the process. (Dkt. 32 ¶¶ 58–60; Dkt. 34 ¶¶ 58–60.) Moreover, no other evidence has been presented to suggest that Plaintiff made any effort to continue the collaborative process by other means. Plaintiff failed to "uphold [his] end of the bargain" by refusing to provide IDFPR with documentation clarifying his medical limitations. *Steffes*, 144 F.3d at 1073. IDFPR cannot be held responsible for Plaintiff's abandonment of the collaborative process. *Id*. Accordingly, IDFPR is entitled to judgment as a matter of law on Plaintiff's failure to accommodate claim (Count II).

### C. Plaintiff's Discrimination and Retaliation Claims Fail

Because employers rarely explicitly state their prejudices, claims brought under Title VII usually proceed under the *McDonnell Douglas* burden shifting framework, which allows plaintiffs to proceed with circumstantial evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). Under the framework, a Plaintiff must first prove a prima facie case. When a plaintiff brings a claim alleging disability discrimination under the ADA, the plaintiff must prove: (1) that he was disabled; (2) that he satisfied his employer's legitimate expectations; (3) that he suffered an adverse employment action; and (4) that similarly situated,

[2] Plaintiff disputes IDFPR's characterization "to the extent it implies that he failed or refused to provide such documentation. Plaintiff was in the process of obtaining the required statement from his physician and had communicated this to [IDFPR]." (Dkt. 34 ¶ 60.) But Plaintiff ignores that his last communication on the topic was to request a new deadline of February 10, 2023—a deadline that he neither met nor asked to be extended.

nondisabled employees were treated better. *Brooks v. Avancez*, 39 F.4th 424, 434 (7th Cir. 2022). Then the defendant employer must put forth a valid, nondiscriminatory, reason for taking the adverse employment action to shift the burden back to the plaintiff who must then prove that the stated reason is pretextual. *Id*.

Pretext means that the employer does not earnestly believe the reason given and that unlawful discrimination was the real cause of the adverse employment action. *Id*. But when the defendant's reason for taking an adverse employment action is that the employee was not meeting the defendant's legitimate expectations, the burden-shifting framework can result in a duplicative inquiry into the plaintiff's job performance. In these situations, "courts may begin with the pretext inquiry" and omit the prima facie analysis. *See Martino v. W. & S. Fin. Grp.*, 715 F.3d 195, 202 (7th Cir. 2013).

Similarly, claims alleging that an employer retaliated against an employee for engaging in a protected activity, such as disclosing a disability, proceed along similar lines. Under a direct method, plaintiffs must show (1) that they engaged in a protected activity; (2) that they suffered an adverse action; and (3) that a causal connection exists between the two. *Dickerson v. Bd. of Trs., 552*, 657 F.3d 595, 601, 602 (7th Cir. 2011). Under a burden shifting approach, a plaintiff must make a prima facie case to shift the burden to the defendant, who must provide a nonretaliatory justification for the adverse action. *Id*. Thereafter, the burden shifts to the plaintiff to prove pretext. *Id*. Proceeding under either method, a plaintiff must show that he

suffered an adverse employment action that was caused by the plaintiff's participation in a protected activity. *Id*.

Because IDFPR asserts that Plaintiff was terminated for poor job performance, assessing whether a triable issue on causation exists as to either the discrimination or retaliation claims can be addressed en masse. Rather than separating evidence into direct or indirect buckets, all evidence will be reviewed holistically as a "single pile" to determine whether Plaintiff has produced enough evidence such that a reasonable jury could find that his termination was discriminatory, retaliatory, both, or neither. *See Ortiz v. Werner Ent., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016).

IDFPR asserts that Plaintiff was terminated because he did not meet IDFPR's legitimate expectations and was performing poorly at his job, not because IDFPR held any discriminatory animus toward him. (Dkt. 33 at 8–12.) Plaintiff argues that this justification is actually pretextual and that IDFPR terminated him because of his disability and his efforts to disclose it. (Dkt. 37 at 8–11.) Plaintiff argues that a jury could infer that his termination was the result of an unlawful motive and points to suspicious timing, lack of accommodations, inconsistent performance evaluations, procedural irregularities, and comparator evidence to support that argument. (Id. at 8–13.) Upon close inspection of the complete record, Plaintiff's argument fails.

*1. The Timing of Plaintiff's Discipline Was Not Suspicious*

Plaintiff first asserts that there is evidence of suspicious timing between his disclosure attempts and the issuance of the CAP and his ultimate firing. (Dkt 33 at 8–9, 14.) According to Plaintiff, the closer a protected event, like disclosing a

disability, is to an adverse employment action, the more likely it is that the former played a role in the later. (*Id.* at 9) citing *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929–31 (7th Cir. 2020). Plaintiff primarily relies on *Cloe v. City of Indianapolis*, where the Seventh Circuit held that a plaintiff had made a sufficient showing of suspicious timing when workplace discipline was unexplainably delayed until after she disclosed her disability. *See Cloe v. City of Indianapolis*, 712 F.3d 1171, 1182 (7th Cir. 2013). Plaintiff argues, analogizing to *Cloe*, that he has presented evidence of suspicious timing because his CAP was issued appropriately six months after his second poor performance review and because he was terminated fifteen days after fully disclosing his ADHD diagnosis. (*Id.* at 10.)

Plaintiff's evidence does not demonstrate suspicious timing between the issuance of the CAP and his attempted disclosure because the cited instances are not actually suspicious in view of the complete record. Plaintiff's CAP was preceded by multiple poor performance reviews, and the record shows that Plaintiff's supervisor was directed to devise the CAP before Plaintiff attempted to disclose his disability. (Dkt. 32 ¶ 26.) Although the CAP was not actually completed before Plaintiff's attempted disclosures, there is no evidence—circumstantial or otherwise—to suggest that Plaintiff's disclosure precipitated the CAP that was already being drafted. Although issuance of the CAP is not the relevant employment action in this case, and serves only as background evidence, the CAP's issuance does not support an inference that IDFPR acted with an improper motive.

Likewise, the documentary evidence shows that Plaintiff's termination was not suspicious. IDFPR's employees decided to terminate Plaintiff before his complete disclosure in 2023. Emails obtained in discovery show that Director Menchaca received approval to terminate Plaintiff several hours before Plaintiff sought to disclose his disability and that discussions about Plaintiff's termination were ongoing in the preceding days. (Dkt. 32-18 at 1.) Although IDFPR decided to hold Plaintiff's termination in abeyance after his full disability disclosure, it is impossible to say that the timing of his termination was suspicious when the substantive decision to terminate Plaintiff was made before Plaintiff's full disclosure on January 25, 2023. (Dkt. 32-17 at 1; Dkt. 32-18 at 1.) Moreover, without any evidence that IDFPR knew of the impending disclosure, and planned to terminate Plaintiff because of it, Plaintiff's termination cannot be considered suspicious.

Finally, Plaintiff's citation to *Cloe* is not persuasive. According to Plaintiff, the delay in finalizing the CAP is suspicious because, as in *Cloe*, such a disciplinary measure should have been effectuated sooner and was finalized only after Plaintiff attempted to disclose his disability. (Dkt. 37 at 8.) But *Cloe* is distinguishable. First, although the delay between the poor performance review and issuance of the CAP in this case was longer than the delay in *Cloe*, the disciplinary process here began before Plaintiff's attempted disability disclosure. (Dkt. 32-18 at 1.) In *Cloe*, that plaintiff was disciplined a month after the plaintiff's misconduct. *Cloe*, 712 F.3d at 1181. That was suspicious because there was no explanation for the delay in a situation normally quickly rectified with a reprimand nor any evidence that the disciplinary process was

even underway before the disclosure. *See id*. But here, a CAP is a more substantial disciplinary step than a reprimand, and the record shows that the CAP was ordered and in development before Plaintiff's disclosure. (Dkt. 32-18 at 1.) This pattern repeats again in relation to Plaintiff's termination, which was planned and approved after a third poor performance evaluation and before Plaintiff's final (and full) disability disclosure in 2023. (Dkt. 32-17 at 1; Dkt. 32-18 at 1.) As a result, the timing of Plaintiff's termination is not analogous to the suspicious termination in *Cloe*.

As a final note, the timing in *Cloe* was suspicious not solely because of the proximity between discipline and disclosure but also because of the proximity between discriminatory comments made by the plaintiff's supervisor and her discipline. *Cloe*, 712 F.3d at 1181. Plaintiff does not point to any similarly discriminatory comments and thus does not present a situation analogous to that in *Cloe*. Plaintiff fails, therefore, to produce evidence suggesting suspicious timing.

*2. IDFPR Did Not Fail to Accommodate Plaintiff*

Plaintiff also argues that IDFPR's failure to accommodate Plaintiff (as shown by the "breakdown in the interactive process") is evidence of discrimination. (Dkt. 37 at 13.) As discussed above, this argument is unpersuasive. *See supra* Part III.B. According to the undisputed record, Plaintiff abandoned the interactive process when he failed to provide documentation that was needed to clarify his medical limitations. (Dkt. 32 ¶ 60; Dkt. 34 ¶ 60.) Plaintiff cannot argue that IDFPR failed to accommodate him when Plaintiff himself failed to uphold his end of the bargain. *See Steffes*, 144

F.3d at 1073. Plaintiff thus does not present sufficient evidence of IDFPR's failure to accommodate.

### *3. IDFPR's Assessment of Plaintiff's Performance Was Not Inconsistent*

Plaintiff asserts that his performance evaluations show a suspiciously inconsistent narrative about his performance. Plaintiff argues that his positive evaluations in certain competencies are inconsistent with his negative evaluations in others and, therefore, that his overall work performance could not be assessed as "unacceptable." IDFPR counters that Plaintiff's assessments were internally consistent, that they were consistent across time, and that they clearly show that Plaintiff was not meeting legitimate expectations. These arguments are addressed in turn.

When trying to demonstrate pretext, a plaintiff's task is to prove that their employer did not earnestly believe the proffered justification, not that the employer was wrong, arbitrary, or harsh in their assessment of the employee's work. *See Hartley v. Wisconsin Bell, Inc.*, 124 F.3d 887, 890 (7th Cir. 1997). Plaintiffs may use evidence of shifting reasoning or inconsistent statements from superiors to support an inference of pretext. *Castro v. DeVry Univ., Inc.* 786 F.3d 559, 564 (7th Cir. 2015). But statements are not considered inconsistent where the record demonstrates different but substantively consistent reasons for terminating a plaintiff. *See Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 565 (7th Cir. 2016); *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994).

Plaintiff fails to provide evidence of inconsistent statements or shifting justifications for his termination. According to the record, Plaintiff received three evaluations that consistently described poor job performance. In Plaintiff's 2020, 2021, and 2022 evaluations, Plaintiff's performance in the competencies initiative, quality, productivity, and leadership were rated as unacceptable. (Dkt. 32 ¶¶ 16, 21, 45.) Moreover, Plaintiff's overall performance was rated as unacceptable in all three evaluations. (*Id.*)

Plaintiff argues that these evaluations are not to be believed because he received positive reviews in competencies such as human relations, which, for example, he argues is incompatible with a poor leadership score. (Dkt. 37 at 10.) Plaintiff neglects to mention that the annual evaluation form sets out these distinct competencies and lists different substantive criteria under them. (See e.g. Dkt. 32-16 at 4.) These evaluation categories are substantively distinct and differences in scoring under them do not show that IDFPR made inconsistent or shifting statements. (*Id.*) Moreover, and as a final note, Plaintiff's few positive reviews also do not plausibly support an inference that Plaintiff was performing his job satisfactorily overall. *See Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 801–802 (7th Cir. 2014). Because Plaintiff's cited performance evaluations cannot reasonably be considered inconsistent, Plaintiff fails to proffer evidence of genuinely inconsistent or shifting statements.

#### *4. IDFPR's Procedural Deviations, if Any, Were Minor*

Plaintiff asserts that IDFPR deviated from its standard accommodation procedures. Plaintiff maintains that IDFPR policy states that the ADA coordinator will conduct the initial intake and then confer with the EEO office to determine whether medical documentation is needed, but Plaintiff was asked to provide this documentation at the outset of the process. In Plaintiff's view, this variance signals IDFPR's nefarious intent. (Dkt. 33 at 12.)

To serve as evidence of pretext, procedural deviations must support an inference of discriminatory intent. "Significant, unexplained, or systematic deviations from established policies or practices" can serve as evidence of pretext. *Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 427 (7th Cir. 1992). But where a plaintiff cannot explain the effect of a procedural deviation, an inference of discrimination may not follow. *See Lohmeier v. Gottlieb Mem. Hosp.*, 147 F.4th 817, 827 (7th Cir. 2025).

First, Plaintiff's supervisors had already received approval to terminate Plaintiff before he reported his ADHD diagnosis. (Dkt. 32-17 at 1; Dkt. 32-18 at 1.) Plaintiff argues that this so-called deviation allowed IDFPR to stall for time to terminate him, but with the decision to terminate already made, the assertion that IDFPR had any reason to stall lacks credulity. It is unlikely that this minor procedural deviation prejudiced Plaintiff in the manner he describes.

Second, and as explained above, Plaintiff abandoned the collaborative accommodation process. Plaintiff argues that a frontloaded document request prevented further discussions about his accommodation request, but Plaintiff points

to no evidence showing that IDFPR employees refused to discuss the matter with him further or that he attempted to engage with them beyond seeking additional time to produce the documentation before still failing to do so. (Dkt 37 at 10.) Plaintiff cannot argue that he was deprived of the benefit of a process that he never completed.

Finally, the cited deviation—if it can even be called that—was minor. Plaintiff laments the frontloaded document request but cannot demonstrate that he would not have been asked to provide the documentation had the procedure been followed as precisely as he demands. Plaintiff admits that he knew documentation would be needed at some level and that he did not think that IDFPR would be able to provide accommodations based on his RAR form alone. (Dkt. 32-1 at 185–191.) At bottom, although Plaintiff presents some evidence of a minor procedural deviation, he fails sufficiently to explain its import in the light of the full record. Stated otherwise, Plaintiff provides no evidence and little argument that procedural precision would have led to a different result.

*5. Plaintiff Cannot Provide Comparator Evidence*

Plaintiff asserts that similarly situated employees without a disability did not face termination. Plaintiff attempts to use his own subordinate as a comparator and argues that his former supervisors testified that similarly situated employees were treated better than he was. But Plaintiff's asserted comparators are not similarly situated to him in all material respects. Plaintiff's arguments therefore fail.

When using comparator evidence, a plaintiff must provide direct comparators that are similar to the plaintiff in "all material aspects." *Perez v. Thorntons, Inc.*, 731

F.3d 699, 704 (7th Cir. 2013). This is a "common sense" examination designed to exclude confounding variables such as differences in rank, role, and performance history. *Id*. When these confounding variables are not filtered out, plaintiffs cannot proceed with comparator evidence. *See id*.

Plaintiff's subordinate does not provide a clear example of comparator evidence. Plaintiff asserts that his own subordinate provides sufficient comparator evidence (Dkt. 37 at 10), but as Plaintiff admits, the subordinate had different tasks and was required to meet different performance metrics than Plaintiff. (*Id.*) Moreover, the subordinate did not hold a managerial role akin to Plaintiff, nor does Plaintiff provide information about the subordinate's disciplinary history or work performance. This leaves far too many confounding variables up to conjecture and does not provide appropriate comparator evidence.

Plaintiff also contends that deposition testimony from Director Menchaca and Deputy Director Dashan confirms that no similarly situated employee was ever subject to corrective action plans or termination as was Plaintiff. (*Id.*) But this overstates what those witnesses said. Director Menchaca stated that he does not recall issuing a CAP to other employees at the same rank as Plaintiff. (Dkt. 32-2 at 62–64, 79.) Nor does Menchaca recall any of those supervisors seeking an accommodation. (*Id.*) In fact, Menchaca testified that none of the other supervisors received evaluations detailing unacceptable performance. (*Id.*) Because no testimony was elicited to suggest that those employees were in a similar disciplinary position

as Plaintiff, the other supervisors under Menchaca's supervision cannot be considered "similarly situated." *See* Perez, 731 F.3d at 704.

Likewise, Deputy Director Dashan's testimony does not suggest that similarly situated employees were treated better than Plaintiff. Dashan testified that she recalled issuing one other CAP during her tenure at IDFPR. Specifically, Dashan recalls discussions about issuing a CAP to a relatively new examiner in the credit union section. (Dkt. 32-4 at 23–25.) Because this person served at a lower rank (supervisors like Plaintiff oversaw examiners), with different duties, in a different section, and for less time than Plaintiff, this individual was not "similarly situated in all material aspects" and cannot be considered a viable comparator. *Id*. In short, Plaintiff fails to tender any legitimate comparator evidence.

*6. The Combined Circumstantial Evidence is Insufficient*

Viewed together, Plaintiff's proffered evidence is insufficient to allow a reasonable jury to infer that IDFPR's stated reason for terminating the Plaintiff was pretextual or that IDFPR's disability disclosure caused his dismissal. As the record reflects, the evidence of suspicious timing Plaintiff cites is not truly suspicious; Plaintiff abandoned the collaborative accommodation process; the pertinent performance evaluations show consistently poor performance; any procedural deviations were minor; and the purported comparator evidence is not reasonably comparative. Plaintiff stands on little more than a minor procedural deviation which, as the Seventh Circuit has explained, is insufficient to support claims under Title VII. *See Hanners v. Trent*, 674 F.3d 683, 695 (7th Cir. 2012); *Lohmeier*, 147 F.4th at 827.

Plaintiff's evidence, when viewed in the light of the full record, does not support Plaintiff's arguments and cannot reasonably support an inference that IDFPR acted unlawfully toward Plaintiff under any method of proof. Accordingly, because Plaintiff cannot present sufficient evidence of pretext or causation with the cited evidence, IDFPR is entitled to judgment as a matter of law on Plaintiff's discrimination and retaliation claims (Counts I and III).

## IV. CONCLUSION

IDFPR's motion for summary judgment is granted.

SO ORDERED in No. 24 C 5472.

Date: September 23, 2026

JOHN F. KNESS
United States District Judge